**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**LOVA G. FARLEY,**

       **Plaintiff,**

**v.**                                      **Case No.: 2:15-cv-07183**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED;** this matter be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and this action be **DISMISSED, with**

**prejudice,** and removed from the docket of the Court.

## I.    Procedural History

On June 1, 2012, Plaintiff, Lova Gay Farley ("Claimant"), completed an application for DIB, alleging a disability onset date of October 1, 2011, due to "back injury; left arm/hand problems; high cholesterol; [and] heart problems." (Tr. at 169, 198). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 13). Claimant filed a request for an administrative hearing, which was held on December 11, 2013, before the Honorable Maria Hodges, Administrative Law Judge ("ALJ"). (Tr. at 29-58). By written decision dated January 16, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13-23). The ALJ's decision became the final decision of the Commissioner on April 10, 2015, when the Appeals Council denied Claimant's request for review. (Tr. 1-8).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 8, 9), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 10, 11, 12). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 50 years old on the date of the alleged onset of disability, and 52 years old on the date of the ALJ's decision. (Tr. at 33, 189). She had finished high school and completed a couple of years of college. (Tr. at 33). Claimant could read, write, and understand English, and her past relevant work included positions as a secretary with a trucking company, as a certified nursing assistant ("CNA") with health care facilities and home health care providers, and as a part-time cleaner in a dental lab. (Tr. at 21, 197, 199).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and

final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed

4

mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2016. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 1, 2011, the date of alleged onset of disability. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease and obesity." (Tr. at 15-17, Finding No. 3). The ALJ also considered Claimant's other alleged impairments, including high cholesterol and heart problems, left arm pain, headaches, and anxiety, but found them to be non-severe. (*Id.*)

Under the third inquiry, the ALJ ascertained that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 17-18, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567(c) except she can frequently climb ramps or stairs, but never ladders, ropes, or scaffolds; frequently stoop, crouch, and crawl; and should avoid concentrated exposure to cold and vibration.

(Tr. at 18-21, Finding No. 5). At the fourth step, the ALJ found that Claimant was capable of performing her past relevant work as a secretary and as a cleaner. (Tr. at 21, Finding No. 6). Although the ALJ found that Claimant could perform her prior relevant work, the ALJ presented a vocational expert with hypothetical questions incorporating Claimant's

age, work experience, education, and RFC to determine whether other work existed in significant numbers in the national economy that could be performed by Claimant. The vocational expert testified that a hypothetical individual with Claimant's characteristics could perform the jobs of inspector and hand packer at the medium exertional level; light level jobs, including marker labeler and grader sorter; and sedentary jobs, such as order clerk and small machine operator. (Tr. at 22-23). In view of the vocational expert's testimony, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and therefore was not entitled to benefits. (Tr. at 23, Finding No. 7).

## IV.   <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant raises three challenges to the decision of the Commissioner. First, Claimant asserts that the Appeals Council erred by not remanding the case for further proceedings in light of new evidence supplied after the ALJ's decision. While her request for review was pending, Claimant supplied the Appeals Council with additional medical evidence from Dr. William Sale, an orthopedist, and Dr. Samer Nasher, a neurologist. According to Claimant, this new medical evidence supported her claim of having a severe upper extremity impairment and significant low back symptoms. Moreover, the new evidence undermined the reasons given by the ALJ for finding Claimant to be less than credible and her symptoms to be less limiting than described by Claimant.

Second, Claimant contends that the ALJ improperly weighed the medical source statement provided by Dr. Charles Vance, Claimant's treating physician. Dr. Vance opined that Claimant was restricted to less than a full range of sedentary work; the ALJ rejected this opinion on the ground that it was not supported by his records. However, Claimant asserts that the ALJ pointed to no findings or notations that contradicted Dr. Vance's opinion. Claimant argues that the ALJ was obligated by applicable regulations and rulings

to give Dr. Vance's opinion significant weight, unless the ALJ could specifically identify persuasive contrary evidence. The ALJ failed to fulfill this mandate; accordingly, remand was required in order to properly weigh Dr. Vance's opinion.

Finally, Claimant alleges that the RFC finding is not supported by substantial evidence, because the ALJ failed to explain the basis for the finding. In Claimant's view, the record contains conflicting opinions, as well as medical findings that are inconsistent with the capabilities and restrictions determined by the ALJ. Nevertheless, the ALJ never discussed her analysis of the medical evidence, nor expressly reconciled the conflicting opinions. As a result, Claimant contends that the Court is precluded from conducting a meaningful review of the ALJ's determination. Claimant argues that the ALJ's errors were not merely harmless procedural deficiencies, because her failure to follow proper procedures tainted the determination process as early as step two and may certainly have resulted in an incorrect disability determination.

In response, the Commissioner maintains that the new evidence submitted to the Appeals Council did not contradict or undermine in any way the ALJ's findings. To the contrary, the Commissioner contends that the records supplied by Dr. Sale actually reinforced the ALJ's conclusion that Claimant was capable of performing her usual work-related functions without restriction. In addition, with respect to Dr. Nasher's notes, the Commissioner argues that Dr. Nasher did not examine Claimant until after the ALJ issued his decision; accordingly, these records were inapplicable to the ALJ's findings. The Commissioner disagrees with Claimant's allegation that the ALJ improperly weighed Dr. Vance's opinions, indicating that the medical evidence created before and around the time of Dr. Vance's medical source statements clearly refute his opinions, which were far too extreme when viewed in relation to the benign physical findings and unremarkable

medical imaging found in the record. The Commissioner concludes that the ALJ fully and properly weighed the medical evidence and medical source statements and crafted an RFC finding that adequately accounted for all of the functional limitations established by Claimant.

## V.   **Relevant Medical History**

While the undersigned has reviewed all evidence of record, only the medical information most relevant to the disputed issues is summarized below:

### *A. Treatment Records*

On December 2, 2010, Claimant presented to Southridge Urgent Care complaining of injuries received when she fell at a client's home. (Tr. at 246). She reported pain in the left upper extremity, left hip, and right thoracolumbar area, with the upper extremity pain being the worst. Her physical examination revealed some bruising just below the hip, spasms in the lower thoracic and upper lumbar spine, and a full range of motion of the upper extremity with pain. Claimant was diagnosed with a contusion of the left upper extremity, contusion of the left hip, and thoracic strain. She was instructed to rest, apply low heat as needed, use Tramadol for pain, and do back stretches. X-rays of her left elbow, left hip, and thoracolumbar spine were ordered, which showed no acute fractures or dislocations, although the spine x-ray revealed some mild degenerative changes. (Tr. at 249-50, 333). Claimant was told to stay off work through December 6, 2010. (Tr. at 246).

Claimant returned to Southridge Urgent Care on December 7, 2010 for a recheck. (Tr. at 247). She complained of pain and "knots" in the left arm and admitted that she did not fill the prescription for Tramadol. On examination, Claimant's arm had green and yellowish bruising, with two areas of subdural hematoma and tenderness. Claimant's diagnosis again was a contusion of the upper extremity and left hip. She was given a

prescription for Lortab and told to use heat for 20-30 minutes. (*Id.*).  Claimant was instructed to remain off of work through December 10, 2010.

On December 12, 2010, Claimant returned with complaints of feeling dizzy. (Tr. at 248). She still had knots along the vein in her arm, which Dr. Amy Kisner felt were a post-traumatic superficial thrombophlebitis. Dr. Kisner ordered a left upper extremity venous duplex study. Claimant was told to remain off of work through December 17, 2010 and to ask if light duty would be an option. (*Id.*). The venous Doppler study was performed on December 14, 2010. (Tr. at 251). It showed no evidence of deep vein thrombosis, but was positive for superficial thrombophlebitis of the left basilic vein and varicosities.

On December 28, 2010, Claimant was evaluated by Dr. Marietta Babayev at the request of Dr. Kisner. (Tr. at 252-54). Claimant reported that she had been injured after slipping on some wet boards when entering a client's home. (Tr. at 252). She tried to catch herself with her left arm, but ultimately fell to the ground. Claimant now complained of pain in the left shoulder, arm, elbow, forearm, wrist, and hand. The pain was constant and was a 10 on a 10-point pain scale approximately half of the time.  Her pain level was currently 5. Claimant indicated that she also had numbness and tingling in the digits of her left hand, and the numbness increased with driving and holding her arm in a dependent position. Her pain decreased with medication, heat, rest, changing position, and elevation of the arm. Claimant stated that she worked as a CNA, usually three days per week, but was now working two light duty days per week. (*Id.*).

Dr. Babayev reviewed the office notes from Claimant's December 12 urgent care visit, the x-ray reports, and the venous Doppler study. She noted Claimant's current medications and took her vital signs. Claimant was measured at 5 feet 5 inches in height and weighed 200 pounds, which correlated with a BMI of 33.28. (Tr. at 253). Claimant

had no other symptoms on a review of systems, except she reported some fluid in her ears. Dr. Babayev performed a physical examination. She found no acute problems with Claimant's spine. Range of motion of the lumbar spine was normal, and station and alignment were within normal limits. Straight-leg raise was negative and sitting root test was negative. Claimant's bilateral upper extremity evaluation showed no gross defects or effusions. She had some fading bruises over her left arm and forearm, but stability was intact. The range of motion of her shoulder, elbow, and wrist were normal, bilaterally, although she had pain with range of motion on the left side. Claimant's rotator cuff, deltoid enthesis, deltoid/biceps muscles, and forearm muscles were all tender. She had some mild swelling of the left upper limb. Tinel's sign was positive at the left wrist and elbow. Her lower extremities were normal. (Tr. at 254). Neurologically, Claimant was able to heel/toe walk and perform tandem gait without difficulty and her gait was otherwise normal. Her coordination was normal, and her muscle strength appeared adequate except for some mild weakness of left finger adduction and hand grip. Deep tendon reflexes were symmetrical and normal, but Claimant's sensation was decreased in the left third and fourth digits.

Dr. Babayev diagnosed Claimant with a left shoulder sprain, left elbow sprain, left wrist sprain, left neuritis, and a contusion of multiple upper limb sites. She ordered a splint with an elbow pad, Lidoderm patches, Naproxen, and physical therapy. Dr. Babayev also requested authority from workers compensation to order nerve conduction studies of the left upper extremity to evaluate possible peripheral nerve injury. She recommended that Claimant continue on light duty with no lifting, pushing, or pulling greater than 5 pounds, and limiting the use of her left upper extremity for 6 weeks. (*Id.*).

On January 26, 2011, Dr. Babayev performed nerve conduction studies on Claimant's left upper extremity. (Tr. at 255-60). The tests revealed evidence of mild neuropathy in the forearm likely secondary to pronator syndrome. Dr. Babayev felt this might be secondary to a traction type injury of the median nerve in the forearm. (Tr. at 260). She noted that Claimant continued to have pain in the left shoulder, elbow, and wrist that was frequent and rated a 6 on a 10-point scale. The pain was present 75% of the time and was worse with activity. Claimant described the pain as aching, and it was associated with numbness and tingling in her fingers, swelling in her wrist, and left shoulder range of motion pain. Claimant continued to work on a light duty schedule. Dr. Babayev stated that she was still waiting for authorization to begin physical therapy. She also wanted to order an MRI of Claimant's left shoulder to check for a rotator cuff tear, and trigger point injections to treat the left pronator muscle pain. (*Id.*).

On February 22, 2011, Claimant presented to Dr. Babayev with complaints related to sleep. (Tr. at 261-62). Claimant indicated that she was excessively sleepy during the day, fell asleep at inappropriate times, had cramps and headaches when arising, and was snoring. She had never undergone a sleep study; accordingly, Dr. Babayev scheduled one. (Tr. at 262). Claimant also complained of continued pain in her left extremity, which worsened with activity. (Tr. at 264). She reported having trouble tolerating even light duty and described her pain that day as 8-9 on a 10-point scale. Dr. Babayev instructed Claimant to stay off of work the remainder of the week and return to light duty the following week. (*Id.*). At a follow-up examination on March 1, 2011, Claimant continued to complain of constant pain in her left extremity. (Tr. at 266). She took one week off from work, but when she returned, she continued to have problems with light duty. However, Claimant reported that medication prescribed to help her sleep better had improved her

11

rest with no side effects. Dr. Babayev documented that she was still waiting for authorization to order physical therapy, do an MRI, and provide trigger point injections. (*Id.*).

On March 30, 2011, Claimant was evaluated by Dr. William Sale, an orthopedist, at the request of her workers compensation carrier. (Tr. at 339-40). She provided Dr. Sale with the history of her accident and the treatment she received at Southridge Urgent Care and from Dr. Babayev. She reported having some outpatient physical therapy with ultrasound, but Dr. Sale noted that no authorization had been given for trigger point injections or an MRI. (Tr. at 339). Claimant stated that she had originally been working on a light duty restriction, but had essentially been off of work for the last month. She was taking Lortab and Tramadol for pain, which helped, as well as Naprosyn, which did not help. Claimant described her pain as an aching along the anteromedial aspect of her forearm with a burning sensation above the elbow and down the anteromedial area of the forearm. The pain did not radiate into the hand. She also felt a catching along the anteromedial aspect of the upper arm and some popping when she moved her shoulder.

On physical examination, Claimant was five foot, six inches in height and weighed 194 pounds. (Tr. at 340). She stood without difficulty and had no evidence of atrophy around her shoulder girdle or in the periscapular or paravertebral areas. Her rotation of the left extremity was full when compared to the right side, and she had no weakness or evidence of impingement. Her range of motion was normal, although she did have some mild tenderness just distal to the medial epicondyle. She had an equivocal Tinel's sign on the left, but no retrograde sensation with dysesthesia referred down into her hand. Dr. Sale diagnosed Claimant with contusion of the left forearm and strain. He wrote that there was "some soft evidence of possible contusion to her median nerve" around the elbow

with some residual median nerve dysfunction. However, there was no evidence of rotator cuff dysfunction of the shoulder. Dr. Sale did not believe there was anything more that Claimant needed in the way of treatment and saw no physical reason for her to be on weight restricted duty at work. He believed her arm strength was fine, and she was dealing with the pain by taking medications. Dr. Sale opined that Claimant's condition should improve with work, and he recommended that she return to work. He did not feel she had reached maximum medical improvement and wanted to see her back in six weeks. (*Id.*).

On May 25, 2011, Claimant returned for her follow-up with Dr. Sale. (Tr. at 344-45). She indicated that she had not returned to work, stating, "I am just not going to do that." (Tr. at 345). Claimant explained that she had not really enjoyed the job she was doing at the time of her injury and had to drive too far for the job. Accordingly, she had starting cleaning an office one day a week while she looked for another job. Claimant reported that she still felt a catch and popping in her arm, but the knot was beginning to go away and she was doing well using her arm. On examination, Claimant had a full range of motion of her shoulder, without weakness or signs of impingement. She had some mild crepitus on the left side, but it was not painful. Her elbow had a full range of motion. Dr. Sale diagnosed Claimant with contusion of the forearm, impingement syndrome of the shoulder, with mild subacromial bursitis that was not painful. He offered Claimant an injection in the subacromial space, but did not go forward with it, since she was not having pain. (Tr. at 344). He did not place any restrictions on Claimant, although she indicated that she did not intend to do a lot of lifting. He told her to return in a couple of months.

Claimant returned to Dr. Sale's office on July 28, 2011. (Tr. at 342-43). She reported being back to pretty normal activities, doing housework, lifting, and working in the garden. (Tr. at 343). She complained of some aching pain on her left wrist and some

intermittent aching pain in her left thigh down to her knee. On examination, Claimant had a full range of motion of her shoulder, elbow, wrist, and hand. She was mildly tender over the radial styloid on the left and had a slightly positive Finkelstein's. She could squat fully and had a full range of motion of the hip and knee. There was mild tenderness over the left great trochanter. Dr. Sale diagnosed Claimant with impingement syndrome of the shoulder, resolved; contusion of the left forearm, resolved; contusion of the left thigh with mild post-traumatic trochanteric bursitis; and low grade de Quervain's tenosynovitis,[1] probably not related to her original fall. (*Id.*). Dr. Sale provided Claimant with an injection at the radial styloid. He indicated that she might occasionally need an injection, but he felt she had reached maximum medical improvement. (Tr. at 342). Claimant expressed her desire to return to a nursing assistant position, and she agreed to come back to his office as needed. (*Id.*).

On October 23, 2012, Claimant presented to Valley Health System's Hart's Clinic and saw Dr. Charles Vance. (Tr. at 291). Claimant complained of lower back pain going into the left leg and hips, with numbness and tingling in the toes, and anxiety. She gave Dr. Vance the history of her fall in 2010, explaining that she had fallen on her left hip, and had an x-ray performed that was normal. However, Claimant indicated that she continued to have pain and had been unable to return to work. Claimant was assessed with chronic lumbar pain and left hip pain. (*Id.*).

Claimant next returned to Dr. Sale's office on January 10, 2013. (Tr. at 341, 346). Her primary complaints were back and left leg pain. She told Dr. Sale that she had never returned to work after her last visit in 2011. (Tr. at 341). She tried to do some light

---

[1] A condition in which the tendons that run from the back of the thumb down the wrist become irritated and swollen. *See* MedlinePlus, U.S. National Library of Medicine, National Institutes of Health, Bethesda, MD., updated 5/15/2014.

housekeeping, but after several months was unable to do the work. She described being "miserable" over the past year or so and having intermittent anxiety attacks. She stated that she was being seen by her family physician, Dr. Charles Vance. However, she was now having increasing pain in her lower back, which went into her leg and caused problems when she tried to bend. She admitted applying for Social Security disability benefits and added that she had not yet settled with workers compensation over her slip and fall injury. She continued to take one to two Lortab per day for pain.

Dr. Sale noted that Claimant was accompanied to the examination by her husband, who "answers as many questions as she does." (Tr. at 341). On examination, Claimant was able to bend and extend with some guarding. She could heel and toe walk, although she favored her left leg. Dr. Sale saw no weakness of Claimant's extremities, and her sensation was intact. Her ankle strength and reflexes were normal. Claimant had good hip range of motion with some tenderness at the superior margin of the greater trochanter on the left and some guarding. Straight-leg raise showed tightness in the hamstrings bilaterally. (Tr. at 346). Dr. Sale ordered imaging studies that revealed normal hip joints and sacroiliac joints, with evidence of longstanding degenerative disc disease.

Dr. Sale diagnosed Claimant with longstanding degenerative disc disease. He felt that she had a lot of stiffness, deconditioning, and anxiety/reactive depressive symptoms. Dr. Sale advised Claimant on a program of mobilization with flexibility, trunk stabilization, and conditioning exercises, which could be done under the supervision of a physical therapist. He told Claimant she would have to get her medications from Dr. Vance and suggested that she request a prescription of Cymbalta. (*Id.*).

Claimant saw Dr. Vance on February 11, 2013 for routine follow-up. (Tr. at 303). Unfortunately, his notes are largely illegible, although it appears that Claimant had a

positive straight-leg raise test on the left, and he diagnosed her with chronic lumbago. She returned to Dr. Vance's office on July 29, 2013 for follow-up on bloodwork; however, his notations are again illegible. (Tr. at 309). It appears that Claimant had right-sided pain and was diagnosed with chronic lumbago and degenerative disc disease. Dr. Vance sent Claimant to Cabell Huntington Hospital on November 21, 2013 to have an MRI of her lumbar spine for the diagnosis of lumbago. (Tr. at 313-14). The imaging was interpreted by Dr. Rodger Blake, who found a mild bulging disc at L1-2 with no significant stenosis; a bulging disc at L3-4 with a foraminal extraforaminal disc protrusion on the left, degenerative changes, mild foraminal stenosis, but no definite nerve root compression; a bulging disc at L4 with some ligament flavum hypertrophy producing mild to moderate neural foraminal stenosis bilaterally; disc bulges diffusely at L5-S1, with degenerative facet hypertrophy bilaterally producing mild narrowing into the lateral recess bilaterally and moderate neural foraminal stenosis. Dr. Blake saw no significant spinal canal stenosis, however. (*Id.*). On November 22, 2013, Claimant called Dr. Vance's office regarding her cholesterol medication. (Tr. at 310). She had been prescribed Crestor, but was not taking it because it caused leg pain and made her feel "bad." Accordingly, Dr. Vance changed her prescription to Lipitor. (*Id.*)

Claimant presented to Dr. Vance's office on February 18, 2014 for a follow-up visit. (Tr. at 349-51). Her chief complaint was back and right leg pain with a knot in her right leg. (Tr. at 349). She stated that her leg "went out on her" and she fell, twisting her ankle. She also had back spasms. Claimant's review of symptoms was otherwise negative. (Tr. at 349-50). On physical examination, Claimant was five foot six inches tall and weighed 203 pounds. She was in no acute distress. Her lower back was tender on palpation, but her straight-leg raise was negative. (Tr. at 350-51). Dr. Vance diagnosed Claimant with

hyperlipidemia and lumbago. (Tr. at 351). He performed a depression screen, which was negative, but Claimant did express little interest or pleasure in doing things. Dr. Vance referred her to Dr. Samer Nasher for pain management. (Id.).

Claimant presented to Dr. Nasher for her initial consultation on March 12, 2014. (Tr. at 324-29). Her chief complaints were back pain, right leg pain, and left arm pain. (Tr. at 324). Claimant told Dr. Nasher that her back pain started in 2010 after a fall, and it had become moderate to severe and constant. (Tr. at 326). About three times per week, the pain radiated into her right leg, and she felt as though her leg would give out. The pain worsened with prolonged sitting, lifting, and walking. Claimant reported that she was unable to do her job as a certified nursing assistant. Claimant also indicated that she occasionally had migraine headaches, associated with photophobia and pulsating pain. (Id.). She had no psychiatric symptoms or constitutional changes. (Tr. at 324). Dr. Nasher performed a physical examination that was remarkable for tenderness over the facet joints at L4-L5 and L5-S1 on the right side. (Tr. at 326). She also had a positive straight-leg raise, cervical muscle spasm, and left occipital cephalgia. The remainder of the examination was unremarkable. Dr. Nasher diagnosed Claimant with chronic low back pain with radiculopathy, facet joint tenderness at L5-S1, disc protrusion at L3-L4, degenerative changes of the lumbar spine, cervical spasm, neck pain, migraine headache, and left occipital cephalgia. He started her on Tramadol and planned to see her in one month. (*Id.*).

It appears that Claimant's second visit with Dr. Nasher was on April 3, 2014. (Tr. at 352). However, only a portion of the record from that visit is included in evidence. That record indicates that Claimant's memory and judgment were intact, and her mood and affect were normal. She had low back pain, but no evidence of misalignment or joint

swelling. Her neurologic examination was normal. Despite the finding of an intact memory, the diagnoses were low back pain and memory loss. She was placed on Norco and Ancept, and her prescription for Ultram was discontinued.  She was instructed to return in one month.

Claimant returned to Dr. Nasher on May 6, 2014 complaining of chronic pain and insomnia. (Tr. at 360-61). She described her pain as moderate to severe, radiating from her low back to her right thigh and right foot with tingling. Activities such as walking, standing, lifting, and bending aggravated the pain. She reported having spasms in her right thigh and indicated that she was unable to do her activities of daily living. Her medications gave her some relief, but Ultram caused insomnia and only helped for about an hour. On the other hand, she did not like Neurontin, because it made her sleepy. Claimant's review of symptoms was otherwise negative. (Tr. at 360). On physical examination, Claimant's extremities appeared normal with peripheral pulses intact. (Tr. at 361). She had a positive straight-leg raise and low back pain, but the remainder of the examination was unremarkable. Dr. Nasher's diagnoses remained the same. He discontinued Norco, and started Claimant on Oxycodone. She was instructed to return in one month. (*Id.*).

Claimant returned on June 9, 2014, with essentially the same complaints. (Tr. at 358). She complained of some memory loss and "wakefulness." Dr. Nasher performed an examination that was normal except for low back pain. His diagnoses did not change. He prescribed Oxycodone and Ambien, and discontinued Aricept. (Tr. at 359). When Claimant returned one month later, on July 7, 2014, she now complained of migraine headaches. (Tr. at 356). According to Claimant, the migraines lasted three days, and she had one each week. Claimant's neurologic examination was unchanged, however. She did

have a positive straight-leg raise on the right. (Tr. at 357). Dr. Nasher diagnosed Claimant with memory loss, chronic low back pain, and migraine headaches. He increased her Oxycodone dosage, continued the Ambien, and administered an occipital nerve block consisting of Kenalog and Lidocaine. (*Id.*).

On August 5, 2014, Claimant presented to Dr. Nasher's office in follow-up. (Tr. at 365-66). She complained of moderate to severe back pain, which was moderately relieved with pain medication, and memory loss. (Tr. at 365). She stated that the Oxycodone made her sleepy. She had no other complaints. Other than low back pain, Claimant's physical examination was unremarkable. (Tr. at 366). Dr. Nasher diagnosed Claimant with chronic low back pain and memory loss. He discontinued Oxycodone and started Roxicodone in its place. He continued Claimant on Ambien and told her to return in one month. (*Id.*).

### B. Evaluations and RFC Opinions

On August 23, 2012, Porfirio Pascasio, M.D. completed a Physical RFC assessment form regarding Claimant at the request of the SSA. (Tr. at 78-79). He opined that Claimant could occasionally lift and carry up to 50 pounds and frequently lift and carry up to 25 pounds. (Tr. at 79). She could stand, walk, or sit approximately 6 hours each in an 8-hour work day. Claimant's ability to push and pull was unlimited and she had no postural, manipulative, visual, communicative, or environmental limitations. (*Id.*). On September 14, 2012, Subhash Gajendragadkar, M.D., reviewed the medical evidence of record, a consultative examination report, and Dr. Pascasio's RFC assessment and indicated that he agreed with the findings made by Dr. Pascasio. (Tr. at 87, 88).

The consultative examination referenced by Dr. Gajendragadkar was performed on August 14, 2012 by Dr. Rakesh Wahi at the request of the SSA. (Tr. at 285-90). Dr. Wahi evaluated Claimant for allegations of back injury, left arm and hand problems, high

cholesterol, and heart problems. (Tr. at 285). Claimant advised Dr. Wahi that her heart problems were diagnosed in 2000 as a mitral valve prolapse. She had an abnormal EKG and was told to get a cardiac catheterization, which she refused. Since then, she had experienced occasional shortness of breath and dizziness, as well as problems lying flat at night when sleeping. Claimant reported that approximately one year earlier, she fell at work, and the injury was severe enough to prevent her from returning to work. She continued to experience pain in her back and left arm and hand with significant stiffness. Claimant also had radiating pain from her back into her left hip. According to Claimant, if she sat for any length of time, she had trouble getting up and walking. She had to limit her sitting to 35-40 minutes at a time before getting up, and then she had to limit her walking to about 15 minutes, or she would have severe pain. Claimant slept poorly at night, but she could do most of her activities of daily living with little assistance. (Tr. at 286). With respect to her arm and hand pain, Claimant stated that although the pain was present, she did not have significant functional limitation. Claimant did suffer from panic attacks, but had not been treated for them.

Dr. Wahi reviewed some records provided by Claimant. (Tr. at 287). He noted that x-rays taken of her elbow and thoracic spine in 2010 were normal, as was a duplex examination of Claimant's left upper extremity performed in December 2010. An EEG study completed in January 2011 likewise appeared to be within normal limits.

Dr. Wahi performed a physical examination of Claimant. (Tr. at 287-88). He observed that Claimant was alert and oriented. She was considerably overweight, weighing 195 pounds at 5 feet, 5 inches in height. (Tr. at 287). Claimant's head, neck, lungs, heart, and abdomen were all unremarkable. (Tr. at 287-88). Her gait and station were noted to be normal, and she could walk on her heels, but not on her toes. (Tr. at

288). Claimant's sensation and reflexes were intact; her range of motion was normal in shoulders, elbows, wrists, hips, and ankles, bilaterally; and her hands could be fully extended, made into fists, and fingers opposed. Claimant's spine had normal cervical flexion. Her thoracic spine showed preservation of the normal slight flexion, and lumbar lordosis was preserved. She had no evidence of muscle spasm, and had a normal range of motion at cervical and lumbar spine with normal straight leg-raising test bilaterally.

Dr. Wahi diagnosed Claimant with multiple blunt trauma and mitral valve prolapse. He indicated that she was having some nonspecific symptoms of shortness of breath that might be related to mitral regurgitation, but he could auscultate no murmurs on examination. He opined that Claimant could carry out her activities of day-to-day living without significant limitation, and although she had pain, there was no objective evidence of limitation of range of motion. (Tr. at 289). An L-spine x-ray series was performed on Claimant that same day, which showed degenerative disc space narrowing at the L5-S1 and bilateral degenerative facet disease at the same level. (Tr. at 283-84).

On December 3, 2013, Dr. Charles Vance wrote a letter regarding his treatment of Claimant. (Tr. at 311-12). He stated that since his initial visit with Claimant in August 2012, he had evaluated her several times for complaints of low back pain radiating into the right leg. Claimant's pain had been consistent and chronic, and Dr. Vance felt the back pain was Claimant's "main disability." (Tr. at 311). Dr. Vance advised that on November 22, 2013, he had an MRI performed on Claimant's spine, which showed desiccation of the disc at L1-2 and L3-4 through L5-S1, inclusive. Disc height was well-maintained, alignment was unremarkable, and there was no stenosis of the spinal cord; however, there were bulging discs at L1-2 and L3-4. In addition, some bulging of the disc at L4-5 with ligament flavum hypertrophy produced mild neural foraminal stenosis bilaterally, and

21

she had bulging discs at the L5-S1 with degenerative facet hypertrophy, producing mild narrowing in the lateral recess bilaterally and moderate neural foraminal stenosis. Dr. Vance concluded that Claimant's symptoms were consistent with her MRI findings. He indicated that her condition was hard to control and would prevent her from working. In particular, Claimant would require "constant repositioning" if she was at a "table job." (*Id.*). She would be unable to bend or stoop, would have trouble walking up and down stairs, and would be unable to move out of the way of moving equipment. Dr. Vance opined that Claimant's significant degenerative changes of the lumbar spine caused sciatic neuropathy into the right leg, requiring her to take pain medications and muscle relaxants. For these reasons, Dr. Vance did not believe Claimant was capable of working. (Tr. at 312).

On December 23, 2013, Dr. Vance completed a Medical Assessment of Ability To Do Work-Related Activities-(Physical) form at Claimant's request. (Tr. at 316-19). Dr. Vance opined that Claimant could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds. (Tr. at 316). He explained that Claimant's low back pain was exacerbated by lifting. Dr. Vance also believed that Claimant's pain limited her to standing and walking no more than 3 hours in an 8-hour workday and only 30 minutes without interruption. He stated that her pain worsened with walking, and she would need to rest to relieve the pain. Dr. Vance felt that Claimant could sit 4 hours in an 8-hour work day, but again would have to change positions every 30 minutes to relieve her back pain. He opined that she could never climb, balance or crawl, and could only occasionally stoop, crouch, and kneel, because spinal flexion increased her pain. (Tr. at 317). As for environmental limitations, Dr. Vance stated that Claimant should avoid vibrations and heights due to her pain. He added that she should not be on elevated

22

surfaces, because her pain symptoms would reduce her ability to save herself if she lost her balance. (Tr. at 318). Dr. Vance did not feel that Claimant had any manipulative, visual, or communicative limitations. When asked what medical findings supported his opinions, Dr. Vance indicated that Claimant consistently presented with back pain and stiffness, and her MRI findings supported the restrictions. (Tr. at 319).

## VI.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

Claimant's first challenge involves evidence submitted to the Appeals Council,

which Claimant believes should have prompted the Appeals Council to remand the matter to the ALJ for further consideration. Her next two challenges address how the ALJ weighed and evaluated evidence submitted to her.

### A.  Evidence Submitted to the Appeals Council

After the ALJ issued her written decision, Claimant submitted treatment records prepared by Dr. William Sale, an orthopedist, and by Dr. Samer Nasher, a neurologist, to the Appeals Council.  (Tr. at 324-31, 338-46, 352, 355-66). The Appeals Council accepted the records into evidence and considered them when looking at Claimant's request for review. (Tr. at 2, 7-8). Notwithstanding this new evidence, the Appeals Council found no basis for changing the ALJ's decision.

Both Claimant and the Commissioner focus their arguments on the newness and materiality of the medical records submitted to the Appeals Council, with Claimant making reference to the four-pronged test in *Borders v. Heckler, 777* F.2d 954, 955 (4th Cir. 1985). However, because the records were submitted to the Appeals Council and incorporated into evidence, disagreements over the newness and materiality of the records are no longer of consequence, and the test in *Borders* does not apply. Instead, the undersigned assumes that any evidence expressly made part of the record by the Appeals Council was implicitly found to be new, material, and relevant to the time period in question. Therefore, given that the Appeals Council incorporated into the record the materials provided by Dr. Sale and Dr. Nasher, the task now is to "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner's] findings." *Flesher v. Colvin*, No. 2:14-CV-30661, 2016 WL 1271511, at *8-12 (S.D.W.Va. Mar. 31, 2016) (citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)). To accomplish this task, the Court must

first "focus on determining whether that new evidence 'is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports.' Where no such conflict is present, the case can be decided on the existing record without remand." *Id. (*quoting *Dunn v. Colvin*, 973 F. Supp. 2d 630, 642 (W.D. Va. 2013); *see, also, Yost v. Astrue*, No. CIV. A. TMD-08-2942, 2010 WL 311432, at *3 (D. Md. Jan. 19, 2010) ("[W]hile evidence considered by the Appeals Council must have been found to be "material", *i.e.* a reasonable possibility that it would have changed the outcome, that alone clearly does not necessitate a finding at the district court level that the case be remanded. Rather, at this juncture, the Court's role is to determine whether the record, as whole (including that evidence considered by the Appeals Council), supports the Commissioner's findings.")

Looking first at Dr. Sale's records, the undersigned **FINDS** that the records do not contradict, conflict with, or call into question the ALJ's findings. Contrary to Claimant's contention that Dr. Sale's records undermine the ALJ's step two finding that Claimant's upper extremity impairment was non-severe, Dr. Sale's records clearly support that finding. Between March and July 2011, Dr. Sale saw Claimant three times for her arm complaints. At his last visit with Claimant on July 28, 2011, Dr. Sale confirmed that Claimant's impingement syndrome of her shoulder had resolved, as had the contusion of her left forearm. (Tr. at 343). Claimant had a full range of motion of her shoulder, elbow, wrist, and hand, and she reported having resumed most of her normal activities, including housework, lifting, and working in the garden. (*Id.*) Although Claimant had a low grade tenosynovitis in the tendons at the back of her thumb, Dr. Sale felt this condition could be effectively treated with an occasional injection. Claimant was given an injection and told to return as needed. There is no indication that she ever returned for the purpose of

Case 2:15-cv-07183   Document 13   Filed 05/12/16   Page 26 of 35 PageID #: 457

having her upper extremity treated. Consequently, Dr. Sale's new records verify that within eight months of her fall, Claimant's upper extremity had healed and was functioning normally. Moreover, Dr. Sale's records are consistent with the August 2012 consultative evaluation report mentioned by the ALJ, which similarly reflected Claimant's normal range of motion of her shoulders, elbows, and wrists. (Tr. at 16).

Claimant's assertion that Dr. Sale's records contradict the ALJ's credibility analysis is equally without merit. In support of her position, Claimant isolates a single statement made by the ALJ during the credibility discussion in which she observed that Claimant did not receive treatment after March 1, 2011 until June 2012. (Tr. at 19-20). Although the ALJ's observation was subsequently proven incorrect by Dr. Sale's new records, the observation was made in the context of a medical care chronology, rather than as a specific judgment by the ALJ. Nevertheless, even if the ALJ intended to imply with this comment that Claimant's treatment gap damaged her credibility, Dr. Sale's records do not assist Claimant in buttressing her allegations. While Dr. Sale's records close the treatment gap between March and July 2011, Claimant still had no documented care for nearly one year between July 28, 2011 and June 26, 2012, when she presented to University Surgical Associates with complaints of indigestion. (Tr. at 281). Notably, Claimant made no complaints of musculoskeletal pain or limitation on this June 2012 visit, and expressed no such complaints until October 23, 2012, a full year after her claimed onset of disability. (Tr. at 281-82, 291). Furthermore, the office notes produced by Dr. Sale reflect that Claimant's upper extremity injuries had resolved by July 2011, and that she had resumed her normal activities with few limitations, which supported an inference that Claimant had not required care for lower back and upper extremity pain for an extended period of time. Consequently, Dr. Sale's notes did not contradict the ALJ's credibility analysis.

26

On the other hand, the undersigned **FINDS** that the Appeals Council erred by not remanding Claimant's case to the ALJ with instructions to consider Dr. Nasher's records. While Dr. Nasher's records do not plainly contradict the ALJ's ultimate determination, they underscore the ALJ's inadequate explanation of the RFC finding, including the weight given to the medical source statements. Because the ALJ failed to properly address the evidence that was available, and Dr. Nasher's records may shed additional light on Claimant's functional limitations related to her degenerative disc disease, this case should be remanded to allow the ALJ to reconsider and explain (1) the weight given to the treating source opinions and (2) the RFC finding, taking into consideration the new evidence found in Dr. Nasher's treatment records.

### B.  Dr. Vance's Opinions and the RFC Finding

Claimant's next two challenges can be addressed together as they concern the ALJ's failure to provide any substantive explanation regarding the RFC finding and the weight given to the medical source statements. Between the third and fourth steps of the sequential disability determination process, the ALJ must ascertain a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (S.S.A. 1996). RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations. *Id.* According to SSR 96-8p, the ALJ arrives at a claimant's RFC by conducting "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is

capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. With allegations of pain or mental distress, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;" 2) "include a resolution of any inconsistencies in the evidence as a whole;" and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

The ALJ "must always consider and address medical source opinions" in assessing the claimant's RFC. SSR 96-8p, 1996 WL 374184, at *7. As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.* Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that

reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§404.1527(a)(2), 416.927(a)(2). The regulations outline how the opinions of acceptable medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). Nevertheless, a treating physician's opinion on the nature and severity of an impairment is afforded ***controlling*** weight only if two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must

remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected … In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* §§ 404.1527(c)(4), 416.927(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Here, the ALJ erred by failing to supply a narrative discussion of the evidence pertaining to Claimant's severe impairment, degenerative disc disease, that described how the evidence supported the RFC finding, citing to specific medical facts and nonmedical evidence. Moreover, the ALJ never commented at all on how or if Claimant's obesity—her other severe impairment—affected her ability to function. *See* SSR 00-3p, 2000 WL 33952015 (S.S.A. 2000). Although the ALJ superficially reviewed some of Claimant's medical findings and treatment, she never pointed to any particular finding, testimony, statement, or medical source opinion that established the non-exertional limitations that were ultimately included in the RFC finding. Indeed, it is impossible to tell how the ALJ arrived at the postural and environmental restrictions contained in the RFC finding given that they differ from the opinions offered by each of the medical sources and are, in part, inconsistent with other evidence in the record; such as,

Claimant's testimony at the administrative hearing. The ALJ made no effort to reconcile the conflicting opinions and statements, and she provided no specific rationale or evidentiary basis for her determination of Claimant's functional capacity. "Because we are left to guess about how the ALJ arrived at [her] conclusions on [Claimant's] ability to perform relevant functions and indeed, remain uncertain as to what the ALJ intended, remand is necessary." *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In addition to supplying an RFC finding that lacked analytical support, the ALJ failed to provide a proper discussion of the reasons for the weight she gave to the medical source statements. The medical evidence indicates that Claimant fell in December 2010. Although she complained of hip and back pain at the time, her primary complaints involved pain in her shoulder, forearm, and hand. In the months that followed, most of the evaluation and treatment received by Claimant concentrated on her left upper extremity. By August 14, 2012, when agency consultant, Rakesh Wahi, performed his consultative examination, Claimant's upper extremity was no longer causing her significant functional limitation. (Tr. at 286). For the first time since the fall, however, Claimant began to complain more strenuously about her back, hip, and leg discomfort. She had minimal treatment records pertaining to those anatomical sites, and Dr. Wahi found few clinical signs to support her complaints of pain. Dr. Wahi opined that Claimant appeared capable of doing most of her day-to-day activities without any major functional limitations. Based upon Dr. Wahi's examination report and the medical records available at the time, two non-examining agency consultants provided opinions in August and September 2012 that Claimant could perform a full range of medium exertional work without any non-exertional limitations.

31

In the written decision, the ALJ expressly addressed the medical source statements of Dr. Wahi and the two non-examining agency consultants. With respect to Dr. Wahi's opinion, the ALJ stated: "The undersigned affords little weight to this opinion when establishing the claimant's residual functional capacity." (Tr. at 21). The ALJ gave no further explanation or reason for rejecting Dr. Wahi's opinion. In regard to the non-examining consultants, the ALJ afforded their evaluations "some weight" to the extent that they found Claimant capable of performing medium level exertional work, but the ALJ again provided no explanation for what evidence supported that particular exertional level and what evidence contradicted the consultants' remaining opinions regarding the lack of non-exertional limitations.

The first record in evidence documenting Claimant's treatment with Dr. Vance is dated October 23, 2012, and five visits are documented in total. Although much of Dr. Vance's handwritten notes are illegible,[2] on December 3, 2013, he prepared a letter purportedly summarizing his treatment of Claimant. In the letter, Dr. Vance stated that Claimant's greatest source of disability was her low back pain, which radiated into her legs. (Tr. at 311). He discussed in some detail a November 2013 MRI of Claimant's lumbar spine that revealed desiccation of the discs from the L1-S1 levels, bulging discs at L1-2, L3-4, L4-5, and L5-S1, and some narrowing and neural foraminal stenosis. Dr. Vance opined that the MRI corroborated his clinical findings of right leg pain, with limitation of motion. He added that Claimant's condition required her to constantly reposition, making it difficult for her to work. Dr. Vance concluded that, after having evaluated Claimant

---

[2] Undoubtedly, one obstacle to a well-reasoned analysis by the ALJ was Dr. Vance's poor handwriting. The ALJ apparently had difficulty deciphering his scrawl, as she stated in the written decision that Dr. Vance saw Claimant on July 29, 2013 for "right shoulder pain." (Tr. at 20). However, when examining the treatment note in the context of Dr. Vance's other materials, it is more likely that the note reads "right sciatic pain;" although even that interpretation is, admittedly, a guess. (Tr. at 309).

"several different times over a period greater than a year, she does has [sic] significant degenerative changes of the lumbar spine, which does [sic] cause sciatic neuropathy into the right leg." (Tr. at 311). He believed that Claimant's condition and necessary use of muscle relaxants and narcotics to relieve pain rendered her unable to work. (Tr. at 312). A few weeks later, Dr. Vance supplemented his letter with a completed RFC assessment form, in which he provided specific opinions about the weight Claimant could lift and carry; the amount of time she could sit, stand, and walk; her need for a sit/stand option; postural and environmental limitations; and other recommendations. (Tr. at 316-19).

As she did with the other three medical sources, the ALJ weighed Dr. Vance's opinions, affording them "little weight." (Tr. at 21). The explanation given by the ALJ for rejecting Dr. Vance's letter and RFC assessment was that "the treatment records do not support this degree of limitation." (*Id.*). The ALJ does not specify which treatment records conflict with Dr. Vance's opinions. Furthermore, she does not provide an analysis of the treatment records specific to Claimant's back and hip complaints anywhere in the RFC discussion that would explain the weight given to Dr. Vance's opinions. "Because the ALJ failed to give 'good reasons ... for the weight [she] g[a]ve [Claimant's] treating source's opinion' and did not provide any support as to why [s]he was giving the physician less weight in certain areas, the ALJ's analysis was insufficient and merits vacating the judgment." *Fox v. Colvin*, 632 F. App'x 750, 756 (4th Cir. 2015) (finding that the ALJ's stated reason for rejecting a treating source's opinion—that being, that it was "not well-supported" by the medical record—was "such a cursory and conclusory analysis" that it did not "provide any reason, let alone a good reason" for rejecting the opinion).

Consequently, the lack of analysis and explanation supporting the RFC finding and justifying the weight given to the multiple medical source opinions prevents this Court

from conducting a meaningful review of the ALJ's decision. Without the ability to review the ALJ's decision, the Court is unable to confirm that the disability determination is supported by substantial evidence. Therefore, this case should be remanded to allow the ALJ to reconsider and explain (1) the weight given to the treating source opinions, and (2) the RFC finding, taking into consideration the evidence found in Dr. Nasher's treatment records.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Plaintiff's Brief in Support of Complaint to the extent that it seeks reversal and remand of the Commissioner's decision (ECF No. 10); **DENY** Defendant's Brief in Support of the Defendant's Decision (ECF No. 11); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of

such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 12, 2016

Cheryl A. Eifert
United States Magistrate Judge